# EXHIBIT H

# SUMMARY
# REAL ESTATE APPRAISAL

PROPERTY OF
UNITED BAPTIST MISSIONARY CONVENTION AND AUXILIARIES, INC.

940 MADISON AVENUE
11TH WARD
BALTIMORE CITY, MARYLAND

APPRAISED FOR
FIRST MARINER BANK

# Robt. Mueller & Associates

### Commercial Real Estate Appraisal Services

February 12, 2010

Mr. Thomas S. Shockley, III
Assistant Vice President
First Mariner Bank
1501 S. Clinton Street
Baltimore, Maryland  21224

RE:   Real Property Appraisal
940 Madison Avenue
11th Ward
Baltimore City, MD

Dear Mr. Shockley,

In accordance with your request, I have made a summary real estate appraisal of the above-referenced property for the purpose of estimating its market value.  The property rights appraised are the fee simple interests.

The subject property was last inspected on February 2, 2010, the effective date of this appraisal.  The inspection revealed that the subject's site consists of approximately 1.135 acres of land area improved by a three-story masonry office building.

The accompanying report sets forth the facts and data used in arriving at the final conclusions.

As a result of my investigation and by virtue of my experience, I have formed the opinion that the market value of the said real estate as of the effective date of this appraisal is:  **TWO MILLION SEVEN HUNDRED THOUSAND DOLLARS ($2,700,000.00), AS IS.**

Respectfully submitted,

Robert J. Mueller
Cert. # 04-4578

P. O. Box 2865, Easton, Maryland  21601   ~   (410) 820-7717  Fax (410) 820-7725

*940 Madison Avenue*                                                    *Robert Mueller & Associates*

## SUBJECT PHOTOGRAPHS



View of front (north) elevation looking southwest



View of rear elevation

_940 Madison Avenue_                                    _Robert Mueller & Associates_

## SUBJECT PHOTOGRAPHS



View of east elevation



View of rear on-site parking lot

*940 Madison Avenue*                                   *Robert Mueller & Associates*

## SUBJECT PHOTOGRAPHS



View looking east along Madison Avenue



View looking west along Madison Avenue

# EXECUTIVE SUMMARY

| | |
|---|---|
| **LOCATION:** | 940 Madison Avenue<br>11th Ward<br>Baltimore City, Maryland |
| **OWNER:** | United Baptist Missionary Convention and Auxiliaries, Inc. |
| **PROPERTY RIGHTS APPRAISED:** | Fee Simple Interests |
| **LAND SIZE:** | 1.135+- acre;<br>49,440.0± square feet |
| **IMPROVEMENTS:** | Three-story (plus lower level) masonry office building containing 35,924.0± square feet of gross building area |
| **ZONING:** | Commercial, B-2-3 |
| **HIGHEST AND BEST USE:** | Present zoning and permitted uses |
| **APPROACHES TO VALUE:** | Sales Comparison and Income |
| **DATE OF ESTIMATE:** | February 2, 2010 |
| **DATE OF REPORT:** | February 12, 2010 |
| **FINAL VALUE ESTIMATE:** | $2,700,000.00, as is |

1

## UNDERLYING ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal is offered based on the following assumptions:

(1)  The title to the property is good and marketable, i.e., free of liens, encroachments, encumbrance, and in responsible management, care and ownership unless noted.

(2)  That no responsibility is to be inferred, as none is implied, to any matter legal in nature. There is no right to expert testimony as a direct result of the submittal of this appraisal.

(3)  All legal descriptions are considered valid and correct as no survey has been made by this appraiser nor has any been contracted. All maps, sketches, plats, or graphic matter is for illustration only and condition one applies thereto.

(4)  That all stamps on deeds indicating sales and purchase price are in accurate relation to the actual dollar amount of the transaction of sale in question.

(5)  All sources of information, data, reference, and description, are considered authoritative, dependable, accurate and correct. However, the appraiser assumes no responsibility for any statement extracted from said source that is not totally authoritative, dependable, accurate, or correct.

(6)  That all taxes have been paid.

(7)  The property is free of all hazardous waste.

(8)  The subject property may have some area of "Non-Tidal Wetlands". Depending upon the quantity of such areas, market values could be adversely affected. The evaluation herein is based upon the assumption that there are no "Non-Tidal Wetlands" that would have a negative impact upon value. This appraiser is not qualified to perform a "Non-Tidal Wetlands" study. This appraiser recommends that any contract of sale for the purchase of the subject property be made contingent upon a "Non-Tidal Wetlands" study so as to enable the buyer to properly assess the impact of same, if any.

(9)  This appraiser has not had the benefit of any environmental audit of the subject site in order to determine the effect upon the value of any adverse environmental conditions such as gas or oil contamination, or any nuisance affecting the subject property. Depending upon the quantity of such influences on a property, the market value could be adversely affected. The evaluation herein is based upon the assumption that there are no adverse environmental conditions affecting the subject property that would have a negative impact on value.

## UNDERLYING ASSUMPTIONS AND LIMITING CONDITIONS, CONTD.

This appraisal is offered based on the following conditions:

(1)   That this appraisal will be considered in its entirety. No authority is granted by virtue of possession or access to this appraisal to utilize any portion separately or out of context of the report.

(2)   Possession or access to this appraisal does not carry with it the right of publication; further, this appraisal is for the exclusive use of the requesting party and may not be used for any other purpose without expressed written approval allowed.

(3)   No reproduction of this report or any part thereof, as stipulated in condition point one, is allowed; nor is any conveyance to the public through any media without written approval allowed.

(4)   Appraisal is not based on any future public or private improvements, nor on a minimum valuation, a specific valuation, or the approval of a loan.

(5)   All restraining conditions, temporary or permanent occurring after the date of this appraisal, having an effect on this appraisal make this report null and void.

(6)   The scope and/or extent of this appraisal consists of the collection of primary data, examination of comparable sales, active listings and pending sales, as well as a consideration of secondary data regarding local and regional market conditions as they relate to an analysis of highest and best use and the estimated market value, as of the effective date of the appraisal report.  All data has been reconciled into a supportable estimate of value.

(7)   Every effort has been made through education and related work experiences to comply with the "competency" provision in the Uniform Standards of Professional Appraisal Practice.

3

## CLIENT

The client is First Mariner Bank.

## INTENDED USER

The intended user of this appraisal report is the client, or any other user so authorized by them.

## INTENDED USE

The intended use of this report is to form a basis for a mortgage financing decision.

## INTEREST VALUED

The Fee Simple Estate is being valued herein.

## FEE SIMPLE DEFINITION

Possession of a title in fee simple establishes absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.
(*The Dictionary of Real Estate Appraisal*, 4th Edition, Appraisal Institute, 2002)

## EXTRAORDINARY ASSUMPTIONS

An assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. (*Uniform Standards of Professional Appraisal Practice*, The Appraisal Foundation, 2006)

None

## HYPOTHETICAL CONDITIONS

That which is contrary to what exists but is supposed for the purpose of analysis. (*Uniform Standards of Professional Appraisal Practice*, The Appraisal Foundation, 2006)

None

## PURPOSE OF APPRAISAL

The purpose of this appraisal is to develop an opinion of the market value of the fee simple interests of the subject property as of February 2, 2010.

## MARKET VALUE DEFINITION

Market Value is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specific date and the passing of title from seller to buyer under conditions whereby:

    a. buyer and seller are typically motivated;

    b. both parties are well informed or well advised and each acting in what he considers his own best interest;

    c. a reasonable time is allowed for exposure in the open market;

    d. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

    e. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

    (*The Dictionary of Real Estate Appraisal*, 4th Edition, Appraisal Institute, 2002)

## SCOPE OF WORK

The scope of work applied in the development of this appraisal includes the following:

1. Inspection of the subject property and its surrounding environment.

2. A review of the site and available improvement plans for the subject property.

3. A search of land records, reporting agency data as well as our internal database for comparable improved and unimproved sales within the subject's market area.

4. Inspection and analysis of comparable sales and rentals and verification of each.

5. Full development of each of the valuation techniques deemed appropriate for the subject property, and correlation of the indicated values into a final value estimate.

## REPORT OPTION

This report is a Summary Appraisal Report in accordance with Standards Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice. As such, it presents sufficient information to enable the client and other intended users, as identified, to understand it properly.

6

## EXPOSURE TIME

Exposure time is the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. Exposure time is always presumed to occur prior to the effective date of the appraisal. The overall concept of reasonable exposure encompasses not only adequate, sufficient and reasonable time but also adequate, sufficient and reasonable effort. Exposure time is different for various types of real estate and value ranges and under various market conditions.

The exposure period is a function of price, time and use, and is not an isolated estimate of time alone.

Information provided by the following commercial real estate brokers leads us to project a five to seven month exposure time for the subject.

| | |
|---|---|
| Colliers Pinkard: | 5 months |
| NAI-KLNB: | 7 months |
| MacKenzie Commercial: | 6 months |

## MARKETING PERIOD

Marketing period is the length of time it takes an interest in real property to sell on the market subsequent to the date of the appraisal. Although the subject market area is experiencing minimal new construction, chiefly a result of current credit restrictions, the regional commercial real estate market appears to be currently stable, based upon a study of average days on market for commercial properties. Utilizing this information, together with the above data provided by brokers, we estimate that the market time for the subject property is six months. Market time is assumed to occur after the date of the appraisal.

7

# LOCATIONAL DATA

*940 Madison Avenue*                                    *Robert Mueller & Associates*

## LOCATION OF PROPERTY

The subject property is located on the southwest corner of the intersection of Madison Avenue and Preston Street, in the 11th Ward of Baltimore City, Maryland.  The subject property has a listed mailing address of 940 Madison Avenue, Baltimore, Maryland 21201.

### LOCATION MAP



*Robert Mueller & Associates*

## NEIGHBORHOOD DATA

## MADISON PARK

The subject property is located within the Madison Park neighborhood in north-central Baltimore City, just west of State Center – a complex of Maryland government buildings. An older, established community, Madison Park extends from Martin Luther King Boulevard on the south to North Avenue on the North, and is bounded by Bolton Hill on the east and Druid Heights on the west.   .

Madison Park consists primarily of townhomes built from the late 19th to the early 20th century, many of which have been converted to multi-family use. Several public housing projects are located north and west of the subject property. The Maryland Government office complex occupies several blocks immediately to the east of the subject site. Maryland General Hospital is one block south.

Although commercial activity in Madison Park itself is limited, the community is close to the Mt. Vernon cultural center, and is just over a mile from Downtown Baltimore.

The area is convenient to the Port of Baltimore, Penn Station, and MTA's Light Rail. BWI-Marshall airport is located eight miles south. The area is served by public schools at the elementary, middle and high levels, churches of various denominations, metropolitan police and fire protection, and public transportation.

It is the opinion of your appraisers that the subject neighborhood will retain its stable characteristics well into the foreseeable future.

## EMPLOYMENT

Although limited employment opportunities are available within the Madison Park community, it's residents can avail themselves of employment throughout the Greater Baltimore metropolitan area. This area contains a large and diversified commercial and industrial base which includes many major national and international companies as well as several large regional firms. The Johns Hopkins Health System represents the largest employer in the Baltimore metropolitan area.

As of October, 2009, the Baltimore City civilian labor force was estimated at 422,606.0, with an unemployment rate of 7.8%, an increase from 5.8% in December of 2008.

## NEIGHBORHOOD DATA, CONTD.

### EMPLOYMENT

During the same time frame, the Maryland unemployment rate had also increased, from an average of 5.8% in December of 2008 to 7.3% as of October, 2009. The U.S. unemployment rate in October of 2009 was 10.2% compared to 7.2% at the end of 2008.

Considered the single largest source of job growth since World War II, the on-going Base Realignment and Closure (BRAC) process is expected to have a significant effect on the economy of the region. Through BRAC, Maryland projects a net gain of 60,000.0 defense and military contract jobs, the majority of which would be located in the Aberdeen Proving Ground facility in Harford County and Fort George Meade military Post in Anne Arundel County. Baltimore City projects that BRAC will generate approximately 4,000.0 new jobs and 3,600.0 new households within the City by 2012.

## REAL ESTATE MARKET – BALTIMORE CITY

### Residential Market

Reflecting the on-going national housing downturn, the Baltimore City residential market has retreated from the highs of 2006. Sales volume in Baltimore County dropped by 25.5% in 2008 compared to 2007, which was slightly below the Baltimore Metropolitan Region's average decline of 30.0%. The average sales price declined by 5.3% and the median sales price dropped to $243,000.00 in 2008, compared to $259,900.00 in 2007. Average sales times increased from 79.0 days on market (DOM) in 2007 to 108 DOM in 2008.

For 2009, quarterly comparisons indicate further market erosion, with the median sales price falling to $225,000.00 year-to-date (November, 2009) and marketing times increasing to an average of 119.0 DOM.

### Commercial Market

As experienced nationally, the volume of commercial real estate sales in the Baltimore Metropolitan Region has declined during the last two years, primarily due to the on-going credit crisis. Rents have moderated to varying degrees in all market segments – retail, office and flex. However, some markets have fared better than others, primarily as a result of the above mentioned BRAC-related activity, especially in Harford and Anne Arundel counties. Vacancy rates have also trended upward in 2009. Direct vacancy in the office market climbed to 15.4% in the third quarter of 2009, compared to 14.1% at the end of 2008. Industrial / flex vacancy rates have also trended upward, rising to 10.8% for the region in 2009 versus 9.6% in 2008.

## REAL ESTATE MARKET, CONTD.

Comprehensive market data for the retail sector is not as readily available. A survey by Colliers International indicates that retail vacancy rates in the Baltimore Metropolitan area increased to 8.7% overall in September of 2009, compared to 6.6% at the end of December, 2008, while average quoted rents dropped by 6.5% to $18.72 per square foot. Highest retail vacancy rates are identified in neighborhood and community strip centers, which have experienced average vacancy rate increases of 131.0 basis points over the last year to an average of 10.2%. Additionally, these centers, which are typically unanchored, are primarily to blame for the high level of negative retail absorption, being plagued by the loss of their few 'mom and pop' tenants, causing their vacancy to rise to the highest level for all retail property types. Regional centers, also greatly affected by the loss of local tenants, have proven to be slightly more resilient, due to their balance of grocery and other necessity-based tenant mix. Within the past eighteen months vacancy rates have been skewed due to bankruptcies of large retailers, such as Circuit City, Boscov's, Linens & Things, Tweeter and consolidations by others, such as Filene's Basement.

## Conclusion / Summary

As seen throughout the entire Greater Baltimore Metropolitan area, the Parkville community experienced significant growth over the decade prior to the economic slowdown which began in 2007. The Baltimore area has fared better than other areas in Maryland and the nation during the on-going economic crisis. There is a general expectation that the national economy will stabilize in the coming year and that the Greater Baltimore region will maintain its position as one of the top metropolitan areas in the country.

# DESCRIPTION OF PROPERTY

940 Madison Avenue _____   *Robert Mueller & Associates*

## HISTORY OF PROPERTY

The subject property was conveyed by Irving J. Glasser, et al, Grantors, to United Baptist Missionary Convention and Auxiliaries, Inc., Grantee, by way of a Deed dated June 15, 1994, and recorded among the land records of Baltimore City in Liber 4324, Folio 434.  The indicated consideration is $600,000.00 in fee simple.  Your appraiser is unaware of any subsequent transfer of the subject property.

The subject property represents a low-rise office building that was renovated within the past five years and is owner-occupied.

*940 Madison Avenue*                                                *Robert Mueller & Associates*

## DESCRIPTION OF PROPERTY

### LAND

| Block Plat Reference: | |
|---|---|
| Ward          11<br>Section       07<br>Block         476<br>Lot           04 | See attached Block Plat prepared by the Baltimore City Department of Public Works. |

| Physical Features: | |
|---|---|
| Size | 49,440.0± sq. ft.; 1.135± acres |
| Configuration | Rectangle<br>210.0± feet wide along west side of Madison Avenue<br>235.5± feet deep |
| Topography | Generally level |
| Access | Vehicle access to parking lot via curb cuts on the west side of Madison Avenue, the south side of Preston Street, and the east side of McCulloh Street. |
| Visibility | Corner lot with good visibility from both directions along Madison Avenue and Preston Street |
| Parking | Macadam-surfaced parking lot at rear of property accommodates approximately 85 vehicles – with designated ADA spaces. Additional on-street metered parking is available along Madison Avenue and Preston Street.<br>Parking ratio (2.4 per 1,000 SF GBA) is considered above-average for office properties in the subject market area. |

15

*940 Madison Avenue*                                    *Robert Mueller & Associates*

## DESCRIPTION OF PROPERTY, CONTD.

### LAND

| Flood Plain | |
|---|---|
| **Community Panel#** | 240087 0011 D |
| **Date** | September 30, 1988 |
| **Flood Zone** | Zone X – area of minimal flooding |
| **Flood Insurance** | Not typically required in this zone |
| **Census Tract** | 1702 |

| Easements, encumbrances | The subject property is encumbered by standard utility easements, which do not affect its functionality or marketability. |
|---|---|
| **Encroachments** | We were not provided a current title report to review and are not aware of any easements, encroachments or restrictions that would adversely affect the use of the site. A title search is recommended to determine whether any adverse conditions exist. |

| Utilities: | |
|---|---|
| **Water / sewer** | Metropolitan water and sewer service |
| **Electric** | BGE |
| **Natural Gas** | BGE |

| Hazardous Conditions: | Your appraiser did not receive any soil, sub-soil or environmental reports pertaining to the subject property. However, no hazardous conditions were observed during the property inspection, and this appraiser has no reason to believe that they exist. Should an environmental study be undertaken, resulting in a negative analysis, your appraiser reserves the right to reconsider this valuation. |
|---|---|

16

## DESCRIPTION OF PROPERTY, CONTD.

### IMPROVEMENTS

The subject property is improved by a three-story, owner-occupied office building, with full, improved lower level. Originally constructed circa 1965, the building has been renovated within the past five years. It measures 114.0± feet wide with a depth of 80.0± feet (plus a bump out for stairwell). Overall, the building contains approximately 35,924.0± square feet of gross building area, of which approximately 27,500.0 square feet is considered as leasable area.

Built on a masonry foundation, the exterior walls are constructed of split-faced CMU, with glass and steel panels on the upper levels. (The upper levels overhang the first floor at the front.) The roof is flat and built-up over steel decking. Windows are dual-glazed fixed panels positioned within extruded aluminum framing. The first floor lobby is accessed via glass passenger doors at the front (east) and north elevations. The north stairwell has a separate exterior door. An overhead door and single metal passenger door provide access to the rear of the building.

The general layout on floors 1-3 includes a lobby on the north side (with elevator and stairwell), with two corridors leading to the office suites. Along the rear corridor are utility/storage rooms and restrooms, as well as a freight elevator and rear stairwell. The first level is divided into multiple private office suites. The lower level comprises a large meeting hall, with attached kitchen facilities and retail bay.

Interior finishes throughout the building include exposed-grid suspended acoustical tile ceilings with recessed fluorescent lighting fixtures, painted sheet rock partition walls, commercial carpeting, ceramic and resilient tile flooring materials.

Each level of the building contains a mechanical room with furnace and air handling equipment. Plumbing and electrical systems have been upgraded. A wet-sprinkler system has been installed throughout the entire building. The passenger elevator has a capacity of 2,500.0 pounds and the freight elevator capacity is 3,500.0 pounds.

On-site improvements include poured concrete sidewalks, curbs and gutters, macadam parking lot and landscaping.

The subject building's chronological age is approximately 47.0 years. Considering renovations within the past five years, we would estimate its current effective age as 18.0 years. Overall, the subject property is considered to be in good physical condition when compared to similar properties within its market area.

## ASSESSMENT DATA AND REAL ESTATE TAXES

2009/2010 Full Cash Value

| | |
|---|---|
| Account No. | 11-07-0476-004 |
| Land | $  939,300 |
| Improvements | 1,085,800 |
| Total Assessment | $2,025,100 |
| Phase-in Value: | $1,735,332 |

Real Estate Taxes 2009-2010

| | |
|---|---|
| State | $ 1,943.57 |
| City | 39,357.33 |
| Total | $41,300.90 |

**Real Estate Taxes:**

The assessment of real property in Baltimore City and in the State of Maryland is based upon a triennial assessment system.  This three-year cycle allows for one-third of all real property to be reviewed and assessed every year.  Each district is divided into three contiguous areas to coincide with each year of the assessment cycle.  By the end of the three-year period, all properties have been reviewed and re-valued at least once.

The assessment process first determines an estimate of market value for a given property, known as Full Cash Value.  The total increase in Full Cash Value is phased in over a three-year period, which limits the increase in assessed value to one-third of the total increase each year.

The current tax rate for the State of Maryland is $0.112 per $100.00 of assessed value, while the Baltimore City rate is $2.268 per $100.00 of assessed value.  The total tax burden for the 2009-2010 Fiscal Year is $41,300.90, which is considered reasonable when compared to similar commercial properties located within the subject market area.

*940 Madison Avenue*                                          *Robert Mueller & Associates*

# ZONING

# HIGHEST AND BEST USE

## ZONING

The subject property is zoned B-2-3, one of five business districts under the Baltimore City Zoning Ordinance. The B-2, Community Business District, is "designed to accommodate the needs of a larger consumer population than is served by the Neighborhood Business District- thus a wider range of uses is permitted for both daily and occasional shopping. There are four subdistricts for bulk regulation.

Approximately 100.0 uses are permitted in the B-2 district, including:

antique shop, apartment hotels, bowling establishments, carpet/rug stores, carry-out food shops, clothing stores, clubs and lodges, day nurseries, employment agencies, fabric shops, financial institutions, hobby shops, jewelry stores, liquor stores, museums, novelty shops, offices, medical and dental clinics, pawn shops, photographers, post office, radio and television stations, religious institutions, rooming and boarding houses, toy store, funeral parlors.

Based upon our review of the B-2-3 zoning regulations, combined with our physical inspection of the subject property and review of all pertinent factors, your appraiser is not aware of any zoning violations at this time. Furthermore, there are no known zoning deficiencies that would prevent the legal use and occupancy of the subject property as of the date of this appraisal.

## HIGHEST AND BEST USE

In determining highest and best use, four criteria must be considered:

1. The use must be physically possible.

   Physically possible involves the physical capabilities of a site, such as size, topography and available utilities.

2. The use must be legally permissible.

   Legally permissible involves, for example, site zoning, land use ordinance, building codes, State and Federal laws and Deed restrictions.

3. The use must be financially feasible.

   The project must yield a return relative to the project risk.

4. The use must be maximally productive.

   Maximally productive involves a comparison of all uses determined to be physically possible, legally permissible and financially feasible.


The highest and best use concept involves the analysis of a property as if vacant and as improved. In analyzing the highest and best use of any property, the appraiser must give careful consideration to the various factors affecting the use of the property such as location, surrounding development, physical characteristics and zoning. It is recognized that in cases where a site has existing improvements, the highest and best use may very well be different from the existing use. The existing use will continue, however, unless land value in its highest and best use exceeds the total value of the property in its existing use. In appraisal practice, the concept of highest and best use represents the premise upon which value is based.

As vacant land, the subject could be developed with a variety of commercially oriented structures, as permitted in the B-2 zoning district. Given that the construction of such improvements is reasonably probable, financially feasible, physically possible, legally permissible and maximally productive, we have concluded that the highest and best use of the land as if vacant would be for commercial development.

The current use of the subject property as an office building is considered its highest and best use, as improved.

# VALUATION

## THE VALUATION PROCESS

The appraisal of real property should be a mirror of the marketplace. As such, all appraisals are predicated on data, in whole or in part, obtained from the market. While the appraisal process is not an exact science, it does involve a systematic process in which the problem is defined; the steps to solve the problem are planned; and all relevant data are compiled, classified, and analyzed. This data is then interpreted into an estimate of value through the utilization of standard procedures and techniques developed through the combined experience of the appraisal profession. These approaches are: The Sales Comparison Approach, Income Approach, and Cost Approach.

The Sales Comparison Approach involves the comparison of similar properties, which have recently sold, with the subject property. Adjustments are usually made to the actual sales prices or the appropriate unit prices of the comparison properties to account for various factors of dissimilarity. These differences are typically found in the time, age, location, physical characteristics, and conditions influencing the sale. When the quantity and quality of the sales data is sufficient, these adjustments are best determined through the interactions of typical buyers and sellers transacting within the subject's market. The comparable sales, once adjusted, will indicate a value range for the subject property. This value range is then correlated into a final indicated value for the subject by this approach.

In utilizing the Income Approach, your appraiser is concerned with the present worth of the future potential benefits of the property. This is generally measured by developing a net income stream, which a fully informed person is warranted in assuming the property would produce during its remaining useful life. After comparison with investments of similar type and class, this net income is capitalized into a value estimate. The Income Approach is developed using market data to support rental and expense estimates.

23

### VALUATION, CONTD.

An allowance for vacancy and credit losses is subtracted from the estimated gross income. The result is an effective gross income. By using an appropriate capitalization rate, the net operating income is converted into an indication of value.

In the Cost Approach, we establish the value of the land as though it were an unimproved site through the Sales Comparison Approach, and then add back to it the replacement cost less depreciation for all of the existing improvements.

Theoretically, each approach is a method or technique based on factual data extracted from the market with which an appraiser develops separate indications of value. The value indications by each approach are then correlated into a final estimate of market value. In the final reconciliation, each approach is weighed relative to its significance, applicability, quantity and quality of supportable data as it pertains to the subject property.

Your appraiser has exercised the Sales Comparison Approach and the Income Approach in determining the market value of the subject property. Although considered, the Cost Approach was not utilized due to the inherent inaccuracy of determining appropriate levels of depreciation for older improvements, such as the subject.

### VALUATION, CONTD.

### SALES COMPARISON APPROACH

The Sales Comparison Approach has been developed using five comparable sales of office properties within the subject's market area. Various elements of each of these sales were compared to the subject property, and appropriate adjustments were made.  All four comparable sales are located within the greater Baltimore City market area.  The unit of comparison utilized is the price paid per square foot of gross building area (GBA).

The first comparable sale is located at 8 - 10 South Street, approximately .75 mile southeast of the subject property, and represents a .11+- acre, or 4,800.0+- square foot B-4-2 zoned lot, improved by a six-story masonry office building containing 28,800.0± square feet of gross building area, and considered to be in average physical condition at the time of sale.  The property sold in May of 2009 for the amount of $1,662,835.00, or the equivalent of $57.74 per square foot of gross building area.  This comparable sale was adjusted upward to reflect an inferior improvement condition relative to the subject property at the time of sale and smaller land area.  Downward adjustments were required to reflect a superior CBD location and smaller improvement size (to offset a greater price paid on a per-square-foot basis).  All other factors were considered to be similar to the subject in terms of property utility and marketability.

The second comparable sale is located at 2305 N. Charles Street, approximately .95 mile northeast of the subject property, and represents a .33+- acre, or 14,201.0+- square foot B-2-3 zoned lot, improved by a three-story masonry office building containing 34,415.0± square feet of gross building area, and considered to be in good physical condition at the time of sale.  The property sold in May of 2008 for the amount of $2,500,000.00, or the equivalent of $70.59 per square foot of gross building area.

### VALUATION, CONTD.

This comparable sale was adjusted upward to reflect a smaller land area and downward to reflect a sale date during a more vigorous market period and .   All other factors were considered to be similar to the subject in terms of property utility and marketability.

The third comparable sale is located at 2521 N. Charles Street, approximately 1.1 mile northeast of the subject property, and represents a .39+- acre, or 17,162.0+- square foot O-R-2 zoned lot, improved by a two-story masonry office building containing 16,640.0± square feet of gross building area, considered to be in average physical condition at the time of sale.   The property sold in May of 2008 for the amount of $1,187,600.00, or the equivalent of $71.37 per square foot of gross building area.   This comparable sale was adjusted upward to reflect an inferior improvement condition relative to the subject property at the time of sale and smaller land area.   Downward adjustments were required to reflect a sale date during a more vigorous market period and smaller improvement size relative to the subject property.   All other factors were considered to be similar to the subject in terms of property utility and marketability.

The fourth comparable sale is located at 4301 Roland Avenue, approximately 2.3 mile northwest of the subject property, and represents a 1.6+- acre, or 70,132.0+- square foot R-6, legal, non-conforming zoned lot, improved by a four-story masonry office building containing 27,795.0± square feet of gross building area, considered to be in average physical condition at the time of the sale.   The property sold in August of 2009 for the amount of $2,450,000.00, or the equivalent of $88.15 per square foot of gross building area.   This comparable sale was adjusted upward to reflect an inferior improvement condition relative to the subject property at the time of sale and inferior zoning classification.   Downward adjustments were required to reflect a superior Roland Park location and smaller improvement size relative to the subject property.   All other factors were considered to be similar to the subject in terms of property utility and marketability.

940 Madison Avenue                                    Robert Mueller & Associates

## VALUATION, CONTD.

Our post-adjustment unit values ranged from a high of $83.74 per square foot of gross building area for comparable sale #4 to a low of $66.40 per square foot for comparable sale #1.   In the final analysis, equal weight was attributed to all four comparable sales, resulting in the selection of a final unit value in the amount of $75.00 per square foot of gross building area.   By multiplying the selected unit value by the subject GBA ($75.00 x 35,924.0 square feet), the resultant indicated value by the Sales Comparison Approach becomes $2,694,300.00, which we have rounded to **$2,700,000.00, as is.**

## VALUATION, CONTD.

## INCOME APPROACH

## DIRECT CAPITALIZATION

We have exercised the Income Approach utilizing the Direct Capitalization method, which develops an estimate of market value by dividing a single year's forecasted net operating income by an appropriate capitalization rate. We have utilized economic, or market rental data within the Income Approach, since the subject property is owner-occupied. A two-year lease, for 3,000.00 square feet on the second floor for $20.00 per square foot had expired on April 30, 2009. A search of the downtown Baltimore City office market indicated rental rates typically ranging from $16.00 per square foot to $20.00 per square foot for Class B office buildings. Class C office buildings typically rent for approximately 20% less - currently ranging from $13.00 to $16.00 per square foot. Examples were found at 201 N. Charles Street ($16.00 per square foot) and 300 Cathedral Street ($19.75 per square foot) for areas larger than 5,000.0 square feet. Expense provisions vary widely, ranging from modified gross to full service. Various factors influence the actual rate, such as: term of lease, location, size and condition of leased area, parking availability, etc. The main competitive advantages of the subject property are its recently renovated, good physical condition and the availability of on-site parking, which is at a premium within the Baltimore City environs. These attributes are somewhat offset by is its location, which is outside of the Central Business District. Considering these factors, we have applied an overall rental in the amount of $15.00 per square foot, incorporating modified gross terms, to the subject property.

## VALUATION, CONTD.

As can be seen in the attached Income Approach worksheet, this produces a Potential Gross Income in the amount of $412,500.00 generated by the subject property on an annual basis. From the Potential Gross Income was deducted a vacancy allowance in the amount of 15.0%, consistent with current market data as described in the market overview section of the neighborhood analysis discussion. The resultant Effective Gross Income is $350,625.00. Applicable operating expenses were then deducted from the Effective Gross Income and represent the following:

**Real Estate Taxes:**

Represents current actual tax burden, based upon full cash value assessment.

**Utilities:**

Responsibility of tenant.

**Insurance:**

Estimated at $.25 per square foot of gross building area for fire and extended coverage policy. Tenant would be responsible for contents policy premiums.

**Management Fees:**

Represents professional management fees at current going rate (6.0% of Effective Gross Income) for similar property types, includes marketing and leasing of the property.

**Repairs and Maintenance:**

Estimated at 2.0% of Effective Gross Income, takes into consideration good physical condition of the subject improvements.

### VALUATION, CONTD.

**Structural Reserves:**

> Represents a sinking fund for capital expense items, such as roof replacement, etc., estimated at 2.0% of the effective gross income.

**Miscellaneous:**

> To provide for any unanticipated expense items during the year, estimated at $5,000.00.

Total operating expenses amounted to $88,239.00, or the equivalent of 25.0% of the Effective Gross Income. When Operating Expenses are deducted from the Effective Gross Income, the resultant Net Operating Income becomes $262,387.00.

Our Net Income is capitalized at a rate of 9.77%, to yield an indicated value by the Income Approach in the amount of $2,685,640.00, which we have rounded to **$2,690,000.00, as is.**

**VALUATION, CONTD.**

**CAPITALIZATION RATE**

Our capitalization rate is established by the Band of Investment Method, which is a mortgage-equity technique that incorporates the weighted average of the mortgage constant and the equity dividend rate. These two rates are weighted by the proportion of mortgage funds and equity to be invested in the subject property. In the case of the subject, the weighted mortgage rate is determined by using a 70.0% Loan-to-Value Ratio and a Mortgage Constant of .09667 (based upon an interest rate of 7.5% and 20-year amortization), which produces a weighted rate in the amount of 6.77%. For the 30.0% Equity portion, we have utilized a 10.0% equity-dividend rate, which generates a weighted rate in the amount of 3.0%. When added to the weighted mortgage rate, the overall rate becomes 9.77%. As a check for reasonableness, the capitalization rate is compared to the most recent national market survey for CBD office property types published by the Appraisal Institute. The third quarter, 2009 survey indicates an overall capitalization rate range for retail property types of from 5.0% to 11.0%. As can be seen, our developed rate falls within the national range. These published rates typically reflect investment-grade properties. In the Greater Baltimore market area, capitalization rates typically trend somewhat higher than the national average for similar property types. For properties similar to the subject, capitalization rates ranging from 8.0% to 11.0% are currently reported.

*940 Madison Avenue*                                                                    *Robert Mueller & Associates*

## VALUATION, CONTD.

### CORRELATION

Having analyzed the subject property in terms of every valuation approach appropriate for it, your appraiser than correlates the total analysis in light of current market conditions and motivations of a typical buyer/investor. The final indications of value by approach are as follows:

| | |
|---|---|
| Sales Comparison Approach | $2,700,000.00 |
| Income Approach | $2,690,000.00 |
| Cost Approach | N/A |

As can be seen, a strong correlation exists between the Sales Comparison Approach and Income Approach indicated values, the two being virtually identical. The Sales Comparison Approach is generally regarded as a most reliable indicator of value, best reflecting the actions of buyers and sellers in the marketplace. The reliability of the Sales Comparison Approach is dependent upon qualitative comparable sales data, and this was available within the market. The underlying weakness of the Sales Comparison Approach is the fact that no two properties are identical, and therefore adjustments must be made to maximize the comparability between the subject and the market extracted sale. It should be noted that, in general practice, the indicated value established by the Income Approach will tend to lag the value formulated by the Sales Comparison Approach, as it did in this case, as a vacancy allowance is incorporated within the Income Approach methodology, while the Sales Comparison Approach assumes a stabilized occupancy level.

## VALUATION, CONTD.

Although considered, the Cost Approach was not exercised, due to the inherent inaccuracy of depreciation level estimates when applied to older construction, rendering the Cost Approach unreliable in this instance.

After considering the strengths and weaknesses of each of the approaches to value, we estimate the market value of the subject property, as of February 2, 2010, to be **TWO MILLION SEVEN HUNDRED THOUSAND DOLLARS ($2,700,000.00), AS-IS.**

# MARKET SALES DATA

*940 Madison Avenue* *Robert Mueller& Associates*

# COMPARABLE SALES PHOTOGRAPHS AND DATA

## IMPROVED COMMERCIAL PROPERTIES



Comparable Sale #1
8 – 10 South Street

| | | | |
|---|---|---|---|
| Location: | Ward 4, Section 11, Block 650, Lot 14 Baltimore City, Maryland Located .75 mile southeast | | |
| Grantor: | 10 South Street, LLC | Grantee: | Baltimore Ten Land, LLC |
| Date of Sale: | May 8, 2009 | Title Reference: | Liber 11632 / Folio 390 |
| Improvement: | Six-story masonry office building | Year Built: | c. 1905 |
| Size: | 28,800.0± sq. ft. GBA | Condition: | Average |
| Lot Size: | .11+- acre; 4,800.0± sq. ft. | Zoning: | Commercial, B-4-2 |
| Selling Price: | $1,662,835.00, in fee | | |
| Analysis: | $1,662,835.00 / 28,800.0 square feet = $57.74 per square foot GBA Normal arms-length transaction in the marketplace. | | |

*940 Madison Avenue*                                    *Robert Mueller & Associates*

# COMPARABLE SALES PHOTOGRAPHS AND DATA

# IMPROVED COMMERCIAL PROPERTIES



**Comparable Sale #2**
**2305 N. Charles Street**

| | |
|---|---|
| Location: | Ward 12, Section 6, Block 3820, Lot 3<br>Baltimore City, Maryland<br>Located .95 mile northeast |

| | | | |
|---|---|---|---|
| Grantor: | Associated Catholic Charities | Grantee: | 2305 North Charles, LLC |
| Date of Sale: | May 30, 2008 | Title Reference: | Liber 10737 / Folio 186 |
| Improvement: | Three-story masonry office<br>building | Year Built/Age: | c. 1967 |

| | | | |
|---|---|---|---|
| Size: | 35,415.0± sq. ft. GBA | Condition: | Good |
| Lot Size: | .33+- acre; 14,201.0± sq. ft. | Zoning: | Commercial, B-2-3 |

| | |
|---|---|
| Selling Price: | $2,500,000.00, in fee |
| Analysis: | $2,500,000.00 / 35,415.0 square feet = $70.59 per square foot GBA<br>Normal arms-length transaction in the marketplace. |

*940 Madison Avenue*                                    *Robert Mueller& Associates*

# COMPARABLE SALES PHOTOGRAPHS AND DATA

## IMPROVED COMMERCIAL PROPERTIES



**Comparable Sale #3**
**2521 N. Charles Street**

| | |
|---|---|
| Location: | Ward 12, Section 3, Block 3831, Lot 12 |
| | Baltimore City, Maryland |
| | Located 1.1 mile northeast |

| | | | |
|---|---|---|---|
| Grantor: | Mark Services, LLLP | Grantee: | Baltimore Healthy Start |
| Date of Sale: | May 28, 2008 | Title Reference: | Liber 12051 / Folio 174 |
| Improvement: | Two-story masonry office | Land Area: | .39 acre; 17,162.0 sq. ft. |
| | building, const circa 1960 | | |
| Size: | 16,640.0± sq. ft. GBA | Condition: | Average |
| | | Zoning: | Commercial, O-R-2 |

| | |
|---|---|
| Selling Price: | $1,187,600.00 in fee |
| Analysis: | $1,187,600.00 / 16,640.0 square feet = $71.37 per square foot GBA |
| | Normal arms-length transaction in the marketplace. |

*940 Madison Avenue*                                    *Robert Mueller & Associates*

## COMPARABLE SALES PHOTOGRAPHS AND DATA

## IMPROVED COMMERCIAL PROPERTIES



**Comparable Sale #4**
**4301 Roland Avenue**

| | |
|---|---|
| <u>Location:</u> | Ward 27, Section 13, Block 4960A, Lot 15<br>Baltimore City, Maryland<br>Located 2.3 miles northwest |

| | | | |
|---|---|---|---|
| <u>Grantor:</u> | Global Facilities Management | <u>Grantee:</u> | Roland Park Real Estate |
| <u>Date of Sale:</u> | August 24, 2009 | <u>Title Reference:</u> | Liber 11946 / Folio 374 |
| <u>Improvement:</u> | Four-story masonry office<br>building | <u>Land Area:</u> | 1.6 acres; 70,132.0 sq. ft. |
| <u>Size:</u> | 27,795.0± sq. ft. GBA | <u>Condition:</u> | Average |
| | | <u>Zoning:</u> | Residential, R-6<br>Legal, non-conforming |

| | |
|---|---|
| <u>Selling Price:</u> | $2,450,000.00 in fee |
| <u>Analysis:</u> | $2,450,000.00 / 27,795.0 square feet = $88.15 per square foot GBA<br>Normal arms-length transaction in the marketplace. |

*940 Madison Avenue*                                      *Robert Mueller & Associates*

## INCOME APPROACH

**INCOME**                                                               **ANNUAL**

| Office building containing | 27,500.0 sq. ft. @ | $15.00 | = | $ | 412,500 |
|---|---|---|---|---|---|

|  | Potential Gross Income |  | $ | 412,500 |
|---|---|---|---|---|
|  | Less: Vacancy Allowance @ 15.0% |  | $ | 61,875 |
|  | Effective Gross Income |  | $ | 350,625 |

**EXPENSES**

| Real Estate Taxes | $41,301 |  |  |
|---|---|---|---|
| Utilities - Tenant | 0 |  |  |
| Insurance @ $.25 per sq. ft. GBA | 6,875 |  |  |
| Management @ 6.0% of EGI | 21,038 |  |  |
| Repairs and Maintenance @ 2.0% of EGI | 7,013 |  |  |
| Structural Reserves @ 2.0% of EGI | 7,013 |  |  |
| Miscellaneous | 5,000 | $ | 88,239 |

|  | Net Income |  | $ | 262,387 |
|---|---|---|---|---|
|  | Capitalization Rate |  |  | 9.77% |

**INDICATED VALUE BY INCOME APPROACH**                $ 2,685,640

**Capitalization Method**

Band of Investment - 20 year fixed @ 7.5%

| Component | Percentage | Factor | Rate |
|---|---|---|---|
| Mortgage | 70.00% | 0.09667 | 6.77% |
| Equity | 30.00% | 0.10 | 3.00% |
| Overall Rate |  |  | 9.77% |

# ADDENDA

*940 Madison Avenue*                                          *Robert Mueller & Associates*

## BLOCK PLAT



*940 Madison Avenue*        *Robert Mueller & Associates*

## ZONING MAP



940 Madison Avenue                                          Robert Mueller & Associates

# FLOOD PLAIN IDENTIFIER



LIBER 4 3 2 4 PAGE 4 3 4

THIS DEED, made this 15th day of  JUNE  in the year one thousand nine hundred and ninety-four by and between IRVING J. GLASSER, RICHARD F. AZRAEL, RICHARD F. AZRAEL, Trustee, HELAINE S. GANN, Trustee, HAL I. GANN, Trustee, and JUDITH G. MARCUS, Trustee, parties of the first part, and UNITED BAPTIST MISSIONARY CONVENTION AND AUXILIARIES, INCORPORATED, party of the second part.

WITNESSETH, that in consideration of the sum of SIX HUNDRED THOUSAND DOLLARS ($600.000.00) and other good and valuable consideration the receipt whereof is hereby acknowledged, the said, IRVING J. GLASSER, RICHARD F. AZRAEL, RICHARD F. AZRAEL, Trustee, HELAINE S. GANN, Trustee, HAL I. GANN, Trustee, and JUDITH G. MARCUS, Trustee, do grant and convey to the said UNITED BAPTIST MISSIONARY CONVENTION AND AUXILIARIES, INCORPORATED, its personal representative/successors and assigns, in fee simple, all that lot of ground situate in the City of Baltimore, State of  Maryland, and described as follows, that is to say:

BEGINNING for the same at a point formed by the intersection of the northeast side of McCulloh Street 60.0 feet wide and running thence binding on the southeast side of said Preston Street North 46 degrees 16 minutes 45 seconds East 235.53 feet to intersect the southwest side of Madison Avenue 66.0 feet wide; thence binding on the southwest of said Madison Avenue South 43 degrees 54 minutes 50  seconds East 210.0 feet to intersect a line drawn parallel with and distant 210.0 feet southeasterly from the southwest side of said Preston Street; thence binding along said line so drawn South 46 degrees 16 minutes 45 seconds West 235.51 feet to intersect the northeast side of said McCulloh Street and thence binding on the northeast side of said McCulloh Street North 43 degrees 55 minutes 15 seconds West 210.0 feet to the point of the beginning. The above described parcel of land contains 49.458 square feet or 1.135 acres. The improvements thereon being known as 940 MADISON AVENUE.

BEING the same lot of ground described in the following deeds recorded among the Land Records of Baltimore City:

(1)   Deed dated December 10, 1971 recorded among the Land Records of Baltimore City in Liber R.H.B. 2866, folio 36, was granted and conveyed by Glasser Leasing Company, Inc. to Irving J. Glasser, H. David Gann, Jonathan A. Azrael and Richard F. Azrael.

(2)   Deed dated December 27, 1984 recorded among the Land Records of Baltimore City in Liber S.E.B., folio 258, was granted and conveyed by Jonathan A. Azrael to Richard Azrael, Trustee

(3)   Deed dated January 2, 1985 recorded among the Land Records of Baltimore City in Liber S.E.B. 407, folio 389, was granted and conveyed by Jonathan A. Azrael, to Richard Azrael, Trustee.

(4)   Deed dated June 1, 1986 recorded among the Land Records of Baltimore City in Liber S.E.B. 948, folio 458 was granted and conveyed by Helanie S. Gann, Personal Representative of the Estate of H. David Gann, to Helanie S. Gann, Hal I. Gann, Judith G. Marcus, Trustees, and Helaine S. Gann.   The said H. David Gann departed this life on or about April 14, 1983. SEE ALSO Estate No. 52256 filed among the Orphans Court of Baltimore County, wherein Helanie S. Gann was appointed Personal Representative of the Estate of H. David Gann.

All taxes for which assessments have been received have been paid to this date

JUNE 30, 1994

Director of Finance of Baltimore City by

(5)  Deed dated October 31, 1986 recorded among the Land Records of Baltimore City in LIber S.E.B. 1066, folio 429, was granted and conveyed by Helaine S. Gann, to Helaine S. Gann, Hal I. Gann and Judith G. Marcus, Trustees.

**TOGETHER** with the buildings thereupon, and the rights, alleys, ways, waters, privileges, appurtenances and advantages thereto belonging, or in anywise appertaining.

**TO HAVE AND TO HOLD** the said described lot of ground and premises to the said UNITED BAPTIST MISSIONARY CONVENTIONS AND AUXILIARIES, INCORPORATED, ITS personal representatives/successors and assigns, in fee simple.

**AND** the said parties of the first part hereby covenant that they have not done or suffered to be done any act, matter or thing whatsoever, to encumber the property hereby conveyed; that they will warrant specially the property hereby granted; and that they will execute such further assurances of the same as may be requisite.

**WITNESS** the hand(s) and seal(s) of the said grantor(s).
Test:

_____          _____
                                   IRVING J. GLASSER, Individually

**STATE OF** Maryland , **City/County of** Baltimore , to wit:

**I HEREBY CERTIFY** that on this 15th day of June , in the year one thousand nine hundred ninety-four before me, the subscriber, a Notary Public of the State aforesaid, personally, appeared IRVING J. GLASSER, Individual, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged the foregoing Deed to be his act, and in my presence signed and sealed the same.
       **IN WITNESS WHEREOF,** I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

**My Commission expires:** 8/1/94

_____          _____
                                   RICHARD F. AZRAEL, Individually
                                   and Trustee, under a Trust Agreement
                                   dated December 27, 1984)

**STATE OF** MARYLAND , **City/County of** BALTIMORE , to wit:

**I HEREBY CERTIFY** that on this 14th day of June , in the year one thousand nine hundred ninety-four before me, the subscriber, a Notary Public of the State aforesaid, personally, appeared RICHARD F. AZRAEL, Individually and Trustee, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged the foregoing Deed to be his act, and in my presence signed and sealed the same.
       **IN WITNESS WHEREOF,** I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

**My Commission expires:** 7/1/95

# 1ST MARINER BANK ❖

---∞---

**From:** Thomas S. Shockley III
**Phone:** 443-573-4979
**Fax:** 410-342-7537

Date: 1/22/10
Commercial Lending Division
File #: 10-I012

**E-Mail:** tshockley@1stmarinerbank.com

**To:**    Robert Mueller Associates, Inc.
PO Box 2865
Easton, Maryland 21601

**Attention:** Bob Mueller

**R. E. Address:** 940 Madison Avenue, Baltimore, Maryland 21201
**Type of Property:** Office building
**Current Status:** Existing structure
**Description:** 1.14 acre site with 37,568 s.f. of enclosed space

This is your authorization to proceed with the appraisal of the above referenced property. The undersigned is your confidential client, *to whom the appraisal should be addressed and delivered.* You are to take all reasonable steps to insure that you and your organization divulge no information concerning your appraisal report to any person other than the undersigned or a duly authorized representative. Your acceptance of this appraisal assignment will confirm that 1st Mariner Bank, its successors and assigns, own and can rely on the appraisal reports which you provide, and that we will be under no restrictions regarding their redistribution to other interested parties of our choice.

The purpose of the appraisal is to estimate the market value of the above referenced property as of the date of your inspection as well as any other dates necessary to the proper completion of the appraisal assignment. The property to be appraised is or may become collateral for a federally related loan transaction. The collateral will be subject to the terms of all known leases and other encumbrances, if applicable.

The appraisal report must be prepared in accordance with the appraisal guidelines and ruling of the Office of the Comptroller of the Currency, Appraisal Standards, 12CFR, Part 34, dated June 7, 1994. Included in these standards is the required conformity with USPAP (Uniform Standards of Professional Appraisal Practice). By accepting this assignment the appraiser acknowledges familiarity with these guidelines. *Please be sure to include a copy of the executed engagement letter as an addendum to the appraisal.*

In addition to these requirements, the appraisal should include the census tract number, and sufficient maps, photographs and layouts (site and building) to allow the reader to fully understand the subject property and the comparable data used in estimating the value of the subject. All appropriate approaches to value are to be developed for this appraisal. If an approach is omitted, an explanation for the omission is required.

**Type of Value(s) Requested:**    "As Is"

**Borrower Contact For Information & Access:** Mr. William Murphy at (410) 571-8775

**1st Mariner Bank Loan Officer Contact:** Mr. William Murphy at (410) 571-8775

The report should be addressed, sent and invoiced to 1ST MARINER BANK *to my attention.* It is our understanding that 2 signed, original copies of the report will be completed and delivered no later than **February 12, 2010** and that the fee will be no greater than **$1,850.00**. Your fee should not be discussed with anyone except the undersigned. Payment of the appraisal fee is contingent upon the bank's review and acceptance of the appraisal report. Please reference above file # on report and invoice as well as your Federal Tax ID #.

Accepted,

Appraiser
Federal Tax ID # 52 - 1849401
Return one copy of your accepted letter.

Sincerely,

Thomas S. Shockley III
Assistant Vice President
Commercial Lending

---∞---

TOTAL P.002

# CERTIFICATION OF THE APPRAISER

*I certify that, to the best of my knowledge and belief:*

The statements of fact contained in this report are true and correct.

The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and is my personal, unbiased professional analyses, opinions and conclusions.

I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*

My analyses, opinions and conclusions were developed and this report is intended to comply with the appraisal related mandates within Title XI of the Federal Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA).

I have made a personal inspection of the property that is the subject of this report.

This appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

No one has provided significant professional assistance to the person signing this report.

I have extensive experience in appraising properties similar to the subject and meet the competency provision of the USPAP.

Robert Mueller & Associates
Robert J. Mueller

February 12, 2010

## QUALIFICATIONS OF APPRAISER

### ROBERT J. MUELLER

**MEMBERSHIP/ AFFILIATIONS**

Certified General Appraiser, Maryland Real Estate Appraisal Commission, Cert. No. 04-4578

Member, Maryland Association of Appraisers

Licensed Broker, Maryland Real Estate Commission

Expert Witness, Circuit Court of Maryland for Baltimore City

**EDUCATION**

Bachelors Degree, Accounting, University of Baltimore, 1974

**APPRAISAL AND CONSULTING ASSIGNMENTS**

Commercial and industrial land, improved residential including conforming and non-conforming apartment and mixed-use structures, improved commercial including shopping centers, office buildings and freestanding retail buildings, improved industrial including warehouse, manufacturing and distribution facilities and special purpose properties such as marinas, funeral homes, automobile dealerships, assisted living facilities and nursing homes.

Primary concentration in Baltimore City and surrounding counties.

**REPRESENTATIVE CLIENTS**

| | |
|---|---|
| Revere Bank | Branch Banking and Trust Co. |
| Carrollton Bank | Howard Bank |
| Community First Bank | Citizens National Bank |
| Americas Bank (CFG) | Baltimore County Savings Bank |
| Northwest Savings Bank | Mid-State Federal Savings |
| First Mariner Bank | Bay Vanguard Savings Bank |
| Slavie Federal Savings | Susquehanna Bank |
| New Windsor State Bank | K Bank |
| Saint Casimirs Savings Bank | Valley National Bank |
| The Patapsco Bank | |